UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Robert Breest</u>,
  Plaintiff

  v.           Civil No. 06-cv-361-SM
               Opinion No. 2008 DNH 012
<u>Attorney General for the</u>
<u>State of New Hampshire</u>,
  Defendant

**O R D E R**

  Plaintiff, Robert Breest, was convicted of the murder of Susan Randall over thirty years ago in state court. He was sentenced to life in prison and has remained incarcerated ever since. He seeks access to genetic material removed from under Ms. Randall's fingernails for the purpose of subjecting it to forensic DNA testing, in the hope of developing evidence to support a claim of actual innocence. The defendant, New Hampshire's Attorney General, who has custody of the material, has moved to dismiss Breest's complaint on several grounds.

  Susan Randall apparently "clawed her assailant 'to the bone'"[1], and it seems generally uncontested at this point, given the record developed in Breest's state criminal case, that modern

---

[1] <u>State v. Breest</u>, No. 72-S-789, New Hampshire Superior Court (Conboy, J.) (July 12, 2007).

DNA testing might establish that he was not the murderer, _if_, that is, he can be excluded as a contributor to the DNA found under Ms. Randall's fingernails.

Breest first sought access to the genetic material in March of 2000, in the context of his state criminal prosecution.  He filed a motion to "bring [the case] forward," and asked the state court to order DNA testing.  See State v. Breest, No. 72-S-789, New Hampshire Superior Court (Merrimack County).  The New Hampshire Superior Court considered Breest's motion as one in support of a potentially meritorious motion for a new criminal trial, and ordered the requested DNA testing under applicable state law, finding, inter alia, that DNA test results would have been admissible at his criminal trial had the technology been available, and that such test results would have been highly probative of his guilt or innocence.  Id.

Three DNA tests were eventually performed on the genetic material by Cellmark Diagnostics, a private laboratory located in Germantown, Maryland.  Cellmark reported that the first test, performed in March of 2001, proved inconclusive, apparently because the questioned sample contained a mixture of the victim's female chromosomes and the assailant's male chromosomes.

2

A second test was performed in April of 2001.  That test (YSTR testing at 4 loci) was capable of eliminating that common source of ambiguity in the testing process — a mixture of male and female chromosomes — by testing only for male chromosomes. Cellmark reported that it was able to compare the known and questioned material at 3 of the 4 loci examined, and that Breest could not be excluded as the source of the male DNA.  Breest responded with affidavits from four experts in the field who opined that Cellmark's conclusions were flawed and the DNA testing procedures it employed were unreliable.

Given those criticisms, the Superior Court allowed additional access to the genetic material for a second round of YSTR testing in January of 2002.  Cellmark again performed the test, and again reported that Breest could not be excluded as the source of the male DNA in the sample, noting a match between his DNA and that in the sample at the 4 loci examined.  One in ten Caucasian males (Breest is Caucasian) could expect their DNA to match the sample at the 4 loci examined in the test.

In May of 2004, Breest sought another DNA test, again in the context of his state criminal case.  DNA technology had improved significantly since the 2002 testing, and a 12 loci YSTR test was

3

then available.  The 12 loci test is more discriminating than the
earlier tests that examined only 4 loci.  The Superior Court
denied that request, however, finding that Breest failed to
demonstrate "why the tests already conducted are not accurate or
why further testing would demonstrate his actual innocence or
would result in a different verdict after trial."  <u>State v.
Breest</u>, 72-S-789, Doc. No. 126 (McGuire, J.).

        In 2006, Breest filed another motion for DNA testing in his
state criminal case, and filed this parallel federal suit as
well.  In this civil case, Breest seeks prospective injunctive
relief against New Hampshire's Attorney General, as custodian of
the genetic material, requiring her to provide an adequate sample
for more definitive DNA testing (i.e., the more discriminating 12
loci YSTR testing, or, presumably, testing under the most
advanced protocol currently available).  The state court has
again denied relief in Breest's criminal case — seemingly based
upon its finding that Breest failed to meet a specific burden
under a recently enacted state statute, RSA 651-D:2, III, that
addresses post-conviction access to genetic evidence for DNA
testing.

By its terms, RSA 651-D:2, III, authorizes a state court to order post-conviction DNA testing if a petitioner establishes, <u>inter</u> <u>alia</u>, that:

> (f)  The evidence sought to be tested was not previously tested under DNA technology <u>or the technology requested was not available at the time of trial</u>.
>
> [or]
>
> (g)  If DNA or other forensic testing was previously done in connection with the case, <u>the requested DNA test would provide results that are significantly more discriminating and probative on a material issue of identity, and would have a reasonable probability of contradicting prior test results.</u>

(emphasis added).

The state statute does not expressly limit the number of post-conviction tests available to a petitioner, but instead thoughtfully ties the availability of additional testing to anticipated advances in technology (i.e., "significantly more discriminating and probative" tests) that might reasonably provide exculpatory results, different from previous test results.

It seems evident that a substantially more discriminating DNA test would ordinarily "have a reasonable probability of contradicting prior test results" — if "contradicting" is

understood to mean "exclude the suspect where a prior DNA test could not exclude that suspect as the source of questioned DNA.[2]" For example, if the prior DNA testing, as in this case, could say no more than that 1 in 10 Caucasian males could have contributed the questioned DNA, and the petitioner could not be excluded from that 10%, but new testing was sufficiently discriminating to measure the probability of contribution at 1 in 2 billion, then it would be fair to conclude that a "reasonable probability of contradiction" exists.  But, where the prior DNA testing was particularly discriminating, say it established that only 1 in 3 billion Caucasian men, including the petitioner, could have been the source of the questioned DNA, a subsequent, even more discriminating, test that could produce a result to an accuracy

---

[2]  The term "contradictory," as used in the statute is perhaps confusing, given the context.  A subsequent and more discriminating DNA test might be capable of eliminating 99.9% of all Caucasian males as the contributor, while the test performed earlier may have been capable of excluding only 50% of all Caucasian males.  If the later, more powerful, test excluded a suspect that was not excluded by the earlier, less powerful test, it would plainly be incorrect to say that the different test results were "contradictory."  There is, of course, nothing inconsistent in saying a suspect is among 50% of Caucasian males who "could have" been the source of a questioned DNA sample, but is conclusively not among .1% who "could have" been the source. The results are different — one test could not exclude the suspect, being too blunt, while the other could — but the results of those tests would be both consistent and not contradictory, since each test provided accurate responses to very different questions, according to varying capabilities.

of 1 in 4 billion, would not as easily qualify as having "a reasonable probability of contradicting prior results."

In using the phrase "have a reasonable probability of contradicting prior test results," I do not think New Hampshire's legislature meant to suggest that courts should casually and uninformedly speculate about future scientific testing outcomes. It is, of course, not possible to know in advance whether a substantially more discriminating DNA test would or would not exclude a suspect.  Rather, I believe the legislature intended to provide liberal access to genetic material for post-conviction DNA testing when evolving technology offers a potentially meaningful and exculpatory result.

In any event, the state court determined that it "cannot conclude that further tests 'would have a reasonable probability of contradicting prior test results.'  RSA 652-D:2, III(g)."  Id. Order, dated July 12, 2007 (Conboy, J.).  Accordingly, Breest's motion for more discriminating DNA testing in his state criminal case was denied.

Breest initially filed this federal civil suit in a pro se capacity, which triggered preliminary review by the Magistrate

Judge.  The Magistrate Judge examined the still-developing, and
complex, law relative to post-conviction access to evidence for
DNA testing, and concluded that Breest's complaint stated a
viable Fourteenth Amendment Due Process claim.  Breest is now
represented by capable legal counsel, who have filed a detailed
legal memorandum in opposition to the Attorney General's pending
motion to dismiss.

## Discussion

Elusive as it may sometimes be, truth is the proper object
of the justice system.  Criminal juries are routinely instructed
not to be concerned about whether the government wins or loses a
particular case, because the government always wins when the
truth prevails and justice is done, whether the verdict be guilty
or not guilty.  Prosecutors, especially, are duty bound to
ascertain the truth, whatever it might be, and not merely to
pursue criminal convictions.  Therefore, it is, or ought to be,
axiomatic that the truth is never untimely and never to be feared
by the government.

There is legitimate debate among federal courts regarding
the existence, nature, and reach of a civil constitutional right,
under the Due Process Clause of the Fourteenth Amendment, to

8

post-conviction access to biological evidence for DNA testing.
See, e.g., Harvey v. Horan, 285 F.3d 298 (4th Cir. 2002) ("Harvey
II").  But even highly respected judges who think such a right
does not exist, and cannot be vindicated under Section 1983,
still generally agree that modern DNA technology, not available
at the time of conviction, ought to be made available in cases
where test results could serve to establish the truth and free
the innocent.  For example, as Chief Judge Wilkinson wrote in
Harvey II:

> There is no doubt that Harvey should receive the
> biological evidence in this case for DNA testing using
> technology that was unavailable at the time his
> Virginia conviction became final.  In fact, the panel
> opinion suggested that the state courts could order DNA
> testing.  See Harvey v. Horan, 278 F.3d 370, 380 (4th
> Cir. 2002)(stating that "state courts are free in ways
> that we are not to set the ground rules by which
> further collateral attacks on state convictions such as
> Harvey's may be entertained").  And that is precisely
> what the state courts have done.  The question before
> us is thus not whether Harvey should or will receive
> the DNA evidence.  He should and he will.  Rather the
> issue is whether a § 1983 action brought in federal
> court in the first instance is the appropriate vehicle
> for him to access that evidence.  (Emphasis supplied.)

Id. at 298.

In this case, as well, it seems to me that Breest should
have the genetic evidence made available for further scientific
testing, taking as true his allegations of inadequate prior
testing, and the development of new and substantially more

9

discriminating technology.  But, it is not so clear in this case that the State will provide access to the evidence in its custody.  The state courts have declined to allow further testing under applicable state law.  (Those courts have not been asked, however, to consider whether a federal constitutional right might provide a discrete basis upon which to grant the relief sought.)  And, New Hampshire's Attorney General, who certainly may provide the necessary sample as a matter of her discretion, seems disinclined to do so, absent extensive litigation and a binding court order.

No doubt the State will say that it opposes Breest's request in the interest of preserving the value of finality of criminal convictions, and, to be sure, finality is an important aspect of the criminal justice system.  But finality falls well below truth on the scale of relative values.  The State might also suggest that repeated test requests would pose an undue administrative burden, but there is scant evidence to support such a claim.  If it can even be called a burden to send a small genetic sample to a qualified laboratory for scientific testing (a sample of material that the State has no apparent interest in preserving for its own purposes) it is a rather negligible one, particularly

given Breest's asserted willingness to pay for the cost of testing.

The issues of federal law presented by this dispute, given that Breest seeks a successive, not a first, test, are somewhat nuanced and complicated, and are "not ones that [federal] courts should particularly relish decision upon, so difficult and delicate . . . are the answers."  Harvey II, 285 F.3d at 307 (Luttig, J).  The immediate legal issue raised by the defendant's pending motion to dismiss is whether plaintiff's complaint describes a cognizable federal cause of action.  In deciding whether it does, this court is bound to accept as true all well-pleaded factual allegations, and to draw all reasonable inferences from those facts in plaintiff's favor.  Dismissal is appropriate only if "it clearly appears . . . that the plaintiff cannot recover on any viable theory."  Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  See also Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 472 (1st Cir. 2002) ("The issue presently before us, however, is not what the plaintiff is required ultimately to prove in order to prevail on her claim, but rather what she is required to plead in order to be permitted to develop her case for eventual adjudication on the merits.") (emphasis in original).

The principal issue at this early stage of the litigation, then, is whether Breest can maintain a viable civil claim against New Hampshire's Attorney General under 42 U.S.C. § 1983 or, stated slightly differently, whether a constitutional post-conviction right to access biological evidence for purposes of DNA testing exists.  Later, more difficult questions will arise, involving the specific circumstances under which such a right can be invoked and the nature, scope and reach of that right.

In Breest's criminal case, the State has effectively conceded that DNA testing could prove critical in either supporting or putting the lie to his claim of "actual" (as opposed to "legal") innocence — an allegation that must be plausibly asserted in a future federal or state habeas corpus petition.  Breest says that evolving scientific technology can now more accurately and reliably determine whether his DNA can be excluded from that found among the victim's fingernail scrapings, and he reiterates that the administrative burden on the State to produce a testable genetic sample is de minimus.  He further claims that technical performance failures substantially undermined the reliability, and therefore the probative value, of the previous ambiguous DNA testing done by Cellmark Laboratories. And, of course, he stresses that current DNA technology is far

more discriminating than the 4 loci tests done earlier.  In other words, he credibly suggests that not being excluded by a 4 loci test says little about the likelihood of exclusion by a more refined test that can examine 12 loci.

Breest's claim for relief in this civil case is rather narrow.  He only seeks access to DNA testing, by a qualified independent laboratory, of biological evidence already in the State's possession, pursuant to a more rigorous and meaningful procedure, and at his own expense.  I am persuaded that there is a federal constitutional right to post-conviction access to genetic material evidence for DNA testing purposes — a right that is rooted in procedural and substantive due process rights protected by the Fifth and Fourteenth Amendments, though the contours and reach of that right remain imprecise.  See, e.g., McKithen v. Brown, 481 F.3d 89 (2d Cir. 2007); Wade v. Brady, 460 F. Supp. 2d 226 (D. Mass. 2006); Godschalk v. Montgomery Cty Dist. Atty's Office, 177 F. Supp. 2d 366 (E.D. Pa. 2001); Savory v. Lyons, No. 06-1296, 2006 WL 3423072 (7th Cir., Sept. 11, 2006); Osborne v. District Atty's Office, 445 F. Supp. 2d 1079 (D. Alaska 2006).  But see, Grayson v. King, 460 F.3d 1328 (11th Cir. 2006); Harvey v. Horan, 278 F.3d 370 (4th Cir. 2002).  The exact nature and scope of that right do, indeed, raise

13

extraordinarily delicate and important legal questions, <u>see,</u>
<u>e.g.</u>, <u>Harvey II</u>, <u>supra</u>; <u>McKithen v. Brown</u>, <u>supra</u>, and courts must
be cautious in developing those contours on a case-by-case and
fact-specific basis.

In support of her motion to dismiss, the Attorney General
argues that plaintiff's success in this civil case will serve to
undermine his state conviction, so this suit effectively
constitutes a petition for federal habeas corpus relief, which he
must bring under, and subject to the restrictions imposed by,
28 U.S.C. § 2254.  The court disagrees.  If plaintiff succeeds in
this civil case, he will have achieved nothing more than an
opportunity to subject a highly relevant biological sample to a
discriminating DNA testing protocol, free from the comparative
inadequacy, and alleged performance deficiencies, said to
undermine the previously reported ambiguous DNA test results.

A more discriminating DNA test may prove inculpatory rather
than exculpatory, or it may be inconclusive.  It is not possible
to know what a more discriminating test result will show.  But
neither this suit, nor further testing, implicates the validity
of Breest's criminal conviction.  <u>See</u> <u>Heck v. Humphrey</u>, 512 U.S.
477 (1994).  Breest's conviction is valid, and it will remain

valid, without regard to any relief granted here.  Unless and until his conviction is overturned in a different proceeding that addresses entirely different issues, Breest will remain in prison.

Accordingly, this suit is not the functional equivalent of a federal habeas petition challenging a state conviction, or the fact of incarceration.  It is just a civil suit aimed at determining, on something of a reliable scientific basis, whether grounds exist upon which Breest might seek future relief from his state conviction, in either state or federal court — the only realistic grounds for such relief at this point being "actual innocence."  So, I do not agree, as the Attorney General argues, that plaintiff's suit is barred as a successive habeas petition.

Next, the Attorney General asserts that plaintiff's claim is barred by the Rooker–Feldman doctrine.  Again, the court disagrees.  Given the Supreme Court's recent clarification of that doctrine in Exxon–Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005), Rooker–Feldman does not apply here.  As explained by the Second Circuit in McKithen, supra, the prior state court orders in Breest's criminal case, denying his request for additional testing under state law, are not the "cause" of

15

his asserted injury here.  He is not seeking to overturn those state court orders in federal court.  Although he does seek identical relief — DNA testing of evidentiary material — he seeks it through an entirely different means, based upon a discrete federal right, rather than through a motion for new trial under state law in his state criminal case.  See McKithen, 481 F.3d at 21–22.  Disposition of his motions for similar relief in the state criminal context did not involve or affect his federal civil claim of right.

Nor do principles of res judicata or collateral estoppel bar this suit.  Plaintiff's earlier efforts in state court were framed exclusively in the context of his criminal case.  The state court's rulings did not involve any determination regarding either the existence, or extent, of a federal civil right to post–conviction access to biological evidence for DNA testing, nor has the Attorney General plausibly shown that plaintiff could have litigated a federal civil claim in the context of his state criminal case.  And, the Attorney General has not shown that the statutory (or common law) right of access previously at issue in the state courts is necessarily coextensive with the federal civil right invoked by plaintiff in this case.  See McKithen, 481 F.3d at 43.

16

Finally, the State's motion also seeks dismissal of any
state law claim raised by plaintiff.  But plaintiff is not
asserting any state law claims in this case; his sole claim is
based upon an assertion that he has a constitutionally protected
right of access to the evidence in the Attorney General's
possession for DNA testing.

## Conclusion

A federal right to post-conviction access to biological
material directly relevant to criminal guilt or innocence, for
DNA testing purposes, does exist.  It is rooted in the liberty
and due process rights protected by the Fifth and Fourteenth
Amendments.  The reach and nature of that right under varying
factual circumstances have yet to be fully described.  But
plaintiff's complaint does assert facts and a legal theory in a
manner sufficient to withstand a motion to dismiss, and defendant
has not demonstrated that his claim is otherwise barred.

As plaintiff has made clear (and the court agrees), this
civil dispute ends upon submission of a testable sample to a
qualified independent laboratory for DNA testing pursuant to
currently available technology.  Given the allegations of
ambiguous earlier test results, allegedly deficient testing

17

procedures and reporting, significant advancements in DNA technology capable of producing substantially more accurate and reliable results, the gravity of the crime of conviction, and the potential significance of the test results sought, as well as the virtually negligible burden on the State to provide a biological sample for testing, the State's reticence to provide a sample is difficult to understand on any principled or pragmatic basis. Certainly, New Hampshire is not overburdened with requests from convicted persons to have biological samples subjected to valid DNA testing procedures not available at the time of conviction. Providing a sample in this case for reputable testing at plaintiff's own expense will surely prove far less burdensome to the State in the end than will the expenditures of time, money, and legal resources required to resist testing (perhaps unsuccessfully). And, further testing, as noted earlier, will only produce scientifically valid, and perhaps useful, information that the State has no legitimate cause to fear.

The motion to dismiss (document no. 12) is denied.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

January 18, 2008

18

cc: Christopher M. Green, Esq.
    Ian M. Dumain, Esq.
    John S. G. Clifford, Esq.
    Neals-Erik W. Delker, Esq.
    Richard W. Head, Esq.
    Nancy Smith, Esq.
    John Vinson, NH DOC-Concord